PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
Victoria C. Knowles, Bar No. 277231
vknowles@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff Jasmine Castrillo and the Proposed Class

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

JASMINE CASTRILLO, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

AMERICAN FAMILY MUTUAL INSURANCE COMPANY, S.I., a Wisconsin entity, d/b/a AMFAM.COM,

Defendant.

Case No. 8:26-cv-01453-MRA-ADS

*Assigned to Judge Monica Ramirez Almadani*

FIRST AMENDED CLASS ACTION COMPLAINT FOR:

(1) VIOLATION OF B&P CODE § 17529.5;
(2) VIOLATION OF PENAL CODE § 638.51; AND
(3) INTRUSION UPON SECLUSION

## I. NATURE OF ACTION

1. This action arises from a deceptive commercial email campaign designed to generate insurance leads and consumer traffic for Defendant American Family Mutual Insurance Company, S.I. (“AMFAM”). The email falsely purported to concern an official audit of the recipient’s veterans’ records, warned that government benefits could be suspended, and directed the recipient through a sequence of commercial websites that promoted insurance products, including AMFAM’s products. After Plaintiff followed that deceptive marketing path to AMFAM.COM, Defendant’s website immediately deployed tracking technologies that collected and transmitted identifying, routing, device, browser, and behavioral information before Plaintiff was provided a meaningful opportunity to consent or decline.

2. California law independently prohibits the use of materially falsified or misleading commercial email and the unauthorized deployment of specified surveillance technologies. Plaintiff seeks relief for both components of the scheme: the deceptive commercial email that induced her visit and the undisclosed tracking that followed immediately upon her arrival at Defendant’s website.

## II. PARTIES, JURISDICTION AND VENUE

3. Plaintiff Jasmine Castrillo is, and at all relevant times was, a citizen and resident of California. Plaintiff owns and uses the California email address identified below. Plaintiff received the deceptive commercial email attached as **Exhibit A**, opened it while located in California, followed the links embedded in or presented through the resulting marketing path, and ultimately visited AMFAM.COM from California.

4. Defendant American Family Mutual Insurance Company, S.I. is a Wisconsin insurance company headquartered and incorporated in Wisconsin. Defendant is therefore a citizen of Wisconsin for purposes of diversity jurisdiction.

5. Defendant operates, controls, participates in, and/or benefits from the AMFAM.COM website and the digital advertising and analytics technologies deployed through that website. When a California resident accesses AMFAM.COM, the website

receives information reflecting the visitor's California location, including the visitor's IP address and related geolocation, routing, browser, and device information. Defendant uses such information for website operation, attribution, analytics, advertising, fraud prevention, audience measurement, and remarketing. See https://www.amfam.com/privacy-security (last accessed July 2026) (noting that Defendant's website collects "sensitive personal information" from visitors including **"precise geolocation (e.g., within 1,850 feet)"**) (emphasis added).

6. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the proposed classes include at least 100 members, minimal diversity exists, and the aggregate amount placed in controversy by the pleaded statutory damages, compensatory damages, punitive damages, and requested relief exceeds $5 million, exclusive of interest and costs.

7. Venue is proper in this District under 28 U.S.C. § 1391 because Plaintiff received and opened the deceptive email in this District, followed the resulting marketing pathway from this District, accessed AMFAM.COM from this District, and suffered the alleged statutory, privacy, and economic injuries in this District.

## III. DEFENDANT'S MARKETING PROGRAM

8. Defendant participates in performance-based customer-acquisition programs through which third-party publishers, comparison websites, lead generators, advertising platforms, and other intermediaries generate referral traffic, quote requests, prospective-customer information, applications, or other measurable consumer responses. The existence, structure, geographic scope, compensation terms, and attribution mechanisms of those programs are uniquely within Defendant's possession and control.

9. Defendant promotes its insurance products and acquires prospective customers through a network that includes third-party publishers, lead generators, affiliate marketers, insurance-comparison websites, advertising platforms, redirect services, and other marketing intermediaries (collectively, "Marketing Intermediaries").

The precise identity and role of each intermediary involved in the campaign at issue are presently unknown to Plaintiff because the relevant contracts, campaign records, attribution data, compensation records, and communications are uniquely within Defendant and the participating intermediaries' possession.

10. One or more Marketing Intermediaries are compensated directly or indirectly based on referral traffic, consumer engagement, quote requests, qualified leads, applications, policy sales, or other measurable performance events. Defendant and/or entities acting on its behalf maintain systems capable of attributing traffic and consumer activity to particular sources, campaigns, publishers, links, or intermediary websites and of accepting, rejecting, auditing, or compensating activity generated through those channels.

11. Defendant receives commercial value from consumer traffic and prospective-customer activity generated through Marketing Intermediaries, including traffic that reaches Defendant through intermediary landing pages, comparison websites, redirect services, or lead-generation platforms. The use of intermediary websites does not sever the economic or technical connection between the originating campaign and the insurance products ultimately promoted.

12. Defendant and/or entities acting on its behalf possess contractual or operational rights to establish marketing standards, identify approved or prohibited promotional methods, monitor campaign performance, reject traffic or leads, suspend particular sources, withhold compensation, terminate participation, and require compliance with applicable law. The precise scope of those rights is contained in agreements and records unavailable to Plaintiff before discovery.

13. The commercial pathway followed by Plaintiff promoted insurance products, including Defendant's products, and was designed to convert recipients of the originating email into insurance prospects. Whether the pathway was operated by one intermediary or several, Defendant's products appeared within the same continuous marketing funnel initiated by the deceptive email. Plaintiff alleges upon information and

belief that Defendant knowingly accepted or exploited traffic, prospective-customer activity, or marketing exposure generated through that funnel. The precise economic and contractual relationships among Defendant, MidasRates, and the other intermediaries are matters for discovery.

14. Defendant knew or reasonably should have known that nationwide digital marketing channels promoting its products would generate traffic and prospective-customer activity from California residents. Defendant's website technologies were capable of identifying the location and referral characteristics of visitors, including whether a visitor arrived from California and the website, campaign, or digital pathway through which the visitor arrived.

## IV. THE DECEPTIVE EMAIL AND COMMERCIAL REDIRECT PATH

15. Plaintiff is a California citizen and the owner and regular user of the personal email address castrillojasmine@yahoo.com. Plaintiff received and accessed the email at issue while located in California.

16. On May 11, 2026, Plaintiff received the commercial email attached as Exhibit A. The email purported to be official correspondence concerning the United States Department of Veterans Affairs and used a misleading sender identity, an unrelated originating domain, and a materially false and misleading subject line and message body. Although the precise person or entity that physically transmitted the email is presently unknown, the email initiated a commercial marketing path that ultimately promoted Defendant's insurance products.

17. The sender and the other Marketing Intermediaries involved in the resulting redirect path participated in a performance-based insurance-marketing campaign intended to generate traffic, leads, quote requests, or other prospective-customer activity for participating insurers, including Defendant. Plaintiff does not presently know the identity of every participant or the precise contractual relationship among them because those matters are concealed from consumers and are uniquely within Defendant and the intermediaries' knowledge.

18. Defendant received or had access to referral, attribution, analytics, campaign, or prospective-customer data sufficient to identify the sources and pathways through which traffic arrived at AMFAM.COM. To the extent Defendant accepted, used, retained, or commercially exploited traffic or consumer information after obtaining knowledge of the deceptive source or means by which it was generated, Defendant ratified and benefited from the campaign.

19. The email was not an isolated informational message. It initiated a coordinated commercial pathway intended to generate insurance-related consumer activity. Each successive page moved Plaintiff farther from the purported government communication and closer to commercial insurance offers, including Defendant's products. The sequence functioned as a continuous lead-generation funnel, notwithstanding the use of multiple domains and intermediary pages.

20. MidasRates presented itself as an insurance-comparison or quote platform and displayed or promoted participating insurers, including Defendant. MidasRates and/or related intermediaries received compensation or other commercial value for generating consumer interaction with participating insurers. The precise nature of Defendant's participation in, knowledge of, or compensation arrangement with MidasRates is presently within Defendant's and MidasRates' exclusive knowledge.

21. The email identified its sender as "Department_of VA_Records" and used the unrelated address trgstvcid@dazerosa.org. It represented that Plaintiff's veterans' records had been audited, that a mandatory benefits adjustment was pending, and that she was required to access a secure portal to avoid suspension or delay. Believing the message concerned an official government matter, Plaintiff opened it and followed the embedded link. The link directed Plaintiff to veterandiscounts.live, which was designed to appear connected to government or veterans' benefits. That site led Plaintiff to MidasRates.com, which displayed insurance offers or products including Defendant's. Plaintiff thereafter followed the commercial pathway to AMFAM.COM.

22. But for the false sender identity, deceptive header information, unrelated originating domain, fabricated governmental affiliation, and misleading claims concerning veterans' benefits, Plaintiff would not have opened the email or followed its commercial links. The deceptive email was therefore a factual and proximate cause of Plaintiff's exposure to the insurance-marketing funnel and her subsequent visit to AMFAM.COM.

23. The email's visible sender name falsely suggested a connection to government veterans' records, while its originating address used the unrelated domain dazerosa.org. The sender identity, originating domain, subject line, government-themed imagery, purported reference number, "high priority" designation, claimed audit, and threatened interruption of benefits operated together to conceal the commercial nature and source of the message. Plaintiff is informed and believes that the complete message headers and embedded links contain additional routing, authentication, tracking, and redirect information identifying the campaign participants, which will be established through discovery and forensic examination.

24. The email received by Plaintiff was generated through standardized digital-marketing infrastructure and was not drafted uniquely for Plaintiff. Its generic content, automated personalization, standardized call-to-action, tracking mechanisms, and commercial redirect path indicate that it was transmitted as part of a broader campaign to multiple recipients. The number of recipients and the identities of campaign participants will be ascertainable through discovery.

25. The email was an "unsolicited commercial e-mail advertisement" within the meaning of Business and Professions Code section 17529.1 because its purpose was to induce recipients to follow a commercial pathway promoting insurance products and related lead-generation offers. Plaintiff had no preexisting business relationship with Defendant or the sender and did not directly consent to receive the email.

26. The email violated Business and Professions Code section 17529.5(a)(2) because its header information and originating domain materially misrepresented the

message's source. The display name "Department_of VA_Records" falsely represented governmental sponsorship, while the originating domain dazerosa.org bore no relationship to the Department of Veterans Affairs, any identified government agency, Defendant, MidasRates, or any disclosed commercial advertiser. Nothing in the header truthfully identified the person or entity that initiated, authorized, or commercially benefited from the message.

27. The email also violated section 17529.5(a)(3) because the subject line—"Unclaimed Adjustment: Check your entitlement status"—was materially false and misleading. Plaintiff had no unclaimed governmental adjustment or identified entitlement. The body compounded the deception by falsely stating that Plaintiff's veteran service records had been audited, that her profile had been flagged for a mandatory federal benefits adjustment, that verification was required, and that failure to act could suspend or delay benefits. In reality, the message did not concern government records, federal benefits, or any official entitlement. It was a gateway to commercial insurance marketing. The subject line and body were therefore calculated to cause a reasonable recipient to open and act upon the email under a false sense of governmental urgency and personal entitlement.

28. The commercial nature of the campaign became apparent only after Plaintiff followed the marketing path to insurance-related websites, including **AMFAM.COM.** Those sites had no connection to the Department of Veterans Affairs, did not administer governmental benefits, and did not concern any audit or suspension of Plaintiff's federal benefits. The complete disconnect between the email's governmental representations and the commercial insurance offers presented through the resulting path demonstrates the materiality of the deception.

29. Plaintiff suffered concrete and particularized harm from the deceptive email. She expended time and attention opening, reviewing, investigating, and attempting to identify the source and purpose of the message; followed links she otherwise would not have visited; lost productive time; and was subjected to unwanted commercial tracking

and data transmission. The message and resulting web activity also consumed device, network, storage, processing, and battery resources. Plaintiff would not have incurred those harms absent the deception.

30. The deceptive email also disrupted Plaintiff's use and enjoyment of her personal email account by introducing fraudulent governmental content into the account, requiring investigation and additional filtering or security precautions, and diminishing the account's utility as a reliable means of communication. These injuries are traceable to the challenged campaign and redressable through statutory, compensatory, declaratory, and injunctive relief.

## V. DEFENDANT'S TRACKING TECHNOLOGIES

31. The tracking technologies deployed through AMFAM.COM caused identifiers associated with Plaintiff's browser or device to be created, accessed, synchronized, or transmitted to Defendant and third-party advertising or analytics platforms. Those identifiers enabled Plaintiff's device or browser to be recognized during subsequent activity across websites, sessions, devices, or applications, thereby depriving Plaintiff of exclusive control over information concerning her online behavior.

32. Defendant failed to establish and implement with due care practices reasonably designed to prevent unlawful commercial email from being used to promote its products. Defendant did not adequately monitor the sources, methods, representations, domains, headers, or subject lines used by Marketing Intermediaries whose campaigns generated traffic or prospective-customer activity involving Defendant.

33. When Plaintiff reached AMFAM.COM, the website caused tracking code, pixels, cookies, scripts, tags, and related technologies ("Tracking Technologies") to operate in connection with Plaintiff's browser and device. Those technologies collected or transmitted information including Plaintiff's IP address, routing and addressing information, device and browser identifiers, page activity, referral information, timestamps, and other behavioral or signaling data to Defendant and one or more third-party analytics or advertising platforms, including Google-related services.

34. Defendant's collection and transmission of Plaintiff's information began immediately upon or shortly after her arrival at AMFAM.COM, before Plaintiff was presented with any meaningful disclosure or afforded a genuine opportunity to reject the tracking. Plaintiff reached Defendant's website only because she had been induced to follow a pathway falsely presented as relating to official veterans' benefits. Defendant's website then converted that deception-induced visit into a data-collection event by immediately gathering and transmitting routing, addressing, device, browser, referral, and behavioral information to Defendant and multiple third-party advertising or analytics recipients. Plaintiff did not knowingly agree that her investigation of a purported government communication would result in such commercial surveillance.

35. The Tracking Technologies captured electronic impulses and information reflecting the source, destination, routing, addressing, and signaling characteristics of communications between Plaintiff's browser, Defendant's website, and third-party domains. The technologies used that information to identify or distinguish Plaintiff's browser, device, network, or source of communication.

36. The Tracking Technologies were capable of combining identifiers and metadata —including IP address, cookie identifiers, device identifiers, operating-system information, browser information, referral source, timestamps, and website activity — to recognize a user or device, associate multiple interactions with the same user or household, and support advertising, attribution, audience measurement, or cross-device profiling.

37. By correlating identifiers, network information, location, timing, and behavioral activity, the Tracking Technologies permitted Defendant and participating third parties to associate Plaintiff's visit with other browsing, devices, advertising profiles, or online activity and to use that association for targeted advertising and analytics.

38. The identification and correlation process described above is commonly referred to as browser or device fingerprinting. It enables an otherwise pseudonymous

visitor to be distinguished, recognized, and linked to information already held by Defendant or third-party platforms, thereby creating or enriching a persistent behavioral profile.

39. The information collected from Plaintiff was valuable because it enabled Defendant and third parties to identify the source and characteristics of Plaintiff's visit, measure and attribute her interaction, associate her activity with existing advertising identifiers or profiles, and use that information for commercial analytics and advertising purposes.

40. Plaintiff did not know, before arriving at AMFAM.COM, that Defendant would immediately cause her identifying and behavioral information to be collected and transmitted to third parties. Had Defendant clearly disclosed the nature, recipients, timing, and purposes of the tracking before it began, Plaintiff would have declined the tracking and would not have continued interacting with the website.

41. The Tracking Technologies began operating before Plaintiff affirmatively consented to their use. They requested, collected, and transmitted information capable of identifying or distinguishing Plaintiff's device, browser, network, referral source, and website activity and permitted that activity to be associated with third-party advertising, analytics, or social-media identifiers.

## VI. CLASS ACTION ALLEGATIONS

42. Plaintiff brings this action under Federal Rule of Civil Procedure 23 on behalf of the following proposed classes:

**Email Class: All California residents who, during the applicable limitations period, received at a California email address one or more commercial emails that directed the recipient, directly or through one or more intermediary websites or redirects, to insurance offers featuring Defendant's products or services and that used the same or substantially similar sender name, originating domain, header format, subject line, or email template as the email attached as Exhibit A.**

**Tracking Class: All California residents who, during the applicable limitations period, visited AMFAM.COM and whose browsers or devices communicated with, or transmitted information to, any of the third-party advertising, analytics, or tracking technologies identified in this Complaint before the visitor affirmatively interacted with any consent mechanism presented on the website.**

43. Plaintiff reserves the right to refine these definitions after discovery. Excluded from the Classes are Defendant; Defendant's parents, subsidiaries, affiliates, officers, directors, and employees; the judicial officers assigned to this action and their immediate families; and any person who validly excludes himself or herself from a certified class.

44. Numerosity. The Classes are sufficiently numerous that joinder is impracticable. The precise number and identities of class members are presently unknown but can be determined through Defendant's website analytics, pixel and tag records, campaign-attribution records, lead records, referral logs, contracts, databases, and records maintained by participating intermediaries and technology providers.

45. Typicality. Plaintiff's Email Class claim is typical because she received the standardized deceptive email and suffered the same statutory violation arising from its false sender identity, domain, header information, and subject line. Her Tracking Class claims are typical because the same website technologies collected and transmitted the same categories of information from her under the same absence-of-consent conditions alleged for other visitors.

46. Adequacy. Plaintiff has no interests antagonistic to the Classes, understands her obligation to represent absent members, and will vigorously prosecute the action. Plaintiff has retained counsel experienced in consumer-protection, privacy, statutory-damages, and class-action litigation.

47. Commonality and Predominance. Common questions include:

whether the challenged emails were commercial email advertisements;

whether Defendant advertised in or commercially benefited from those emails within the meaning of section 17529.5;

whether the emails used materially falsified or misleading domain names, headers, sender identities, or subject lines;

whether Defendant maintained reasonable practices to prevent unlawful affiliate email;

which Tracking Technologies operated on AMFAM.COM;

what information those technologies captured or transmitted;

when the technologies began operating relative to any consent mechanism;

whether the technologies constitute devices or processes covered by Penal Code sections 638.50 and 638.51;

whether Defendant intentionally intruded upon private affairs;

whether the alleged intrusion would be highly offensive to a reasonable person; and

the appropriate classwide relief.

48. Superiority. A class action is superior because the claims arise from standardized emails, common marketing infrastructure, uniform website code, and common data-collection practices; the individual statutory and compensatory damages may be insufficient to justify separate litigation; and class treatment will promote consistent adjudication and conserve judicial resources.

49. Ascertainability and Classwide Proof. Members of the Email Class may be identified through campaign transmission records, recipient lists, suppression files, lead records, tracking links, redirect logs, attribution records, and records maintained by the sender and participating intermediaries. Members of the Tracking Class may be identified or their number established through website logs, consent-management records, analytics records, tag-manager configurations, server logs, cookie or identifier records, and records maintained by the third-party technology providers receiving the data.

## VII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

Violation of Cal. Business & Professions Code § 17529.5

50. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

51. Plaintiff received the commercial email attached as Exhibit A at her California email address while located in California and within the applicable limitations period.

52. The email violated Business and Professions Code section 17529.5(a)(2) because its sender identity, header information, and originating domain materially misrepresented its source, and violated section 17529.5(a)(3) because its subject line materially misrepresented the email's contents and subject matter.

53. Defendant advertised in the challenged commercial email because the email initiated a continuous commercial marketing path that directed recipients to promotional materials and insurance offers featuring Defendant's products. Defendant was an intended commercial beneficiary of the campaign and is strictly liable under section 17529.5 regardless of whether Defendant physically transmitted the email itself.

54. Defendant did not establish and implement, with due care, practices and procedures reasonably designed to prevent unlawful commercial email from being used to advertise its products and therefore is not entitled to any statutory reduction in liquidated damages.

55. Plaintiff and members of the Email Class are entitled to the remedies authorized by section 17529.5, including actual damages or liquidated damages of $1,000 for each unlawful commercial email, reasonable attorney's fees and costs, and appropriate equitable relief.

### SECOND CAUSE OF ACTION

Violations of the California Trap and Trace Law

Cal. Penal Code § 638.51

56. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

57. California's trap-and-trace provisions are part of the California Invasion of Privacy Act, Penal Code section 630 et seq.

58. CIPA was enacted to protect Californians from technologies capable of secretly monitoring or capturing electronic communications and information identifying their sources. The statute regulates the installation or use of a pen register or trap-and-trace device or process without judicial authorization.

59. Penal Code section 638.50(c) defines a "trap and trace device" as "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."

60. Penal Code section 638.51(a) provides, subject to statutory exceptions, that a person may not install or use a pen register or trap-and-trace device without first obtaining a court order.

61. Defendant installed or used devices or processes through AMFAM.COM that captured incoming electronic impulses and information identifying the source of communications from Plaintiff's browser, including IP address, originating network information, referral source, URL or domain information, device and browser identifiers, cookie or advertising identifiers, and other routing, addressing, or signaling information. Those technologies enabled Defendant and third parties to identify or distinguish the source of Plaintiff's electronic communications.

62. Defendant installed or used the foregoing devices or processes without obtaining a court order and without satisfying any applicable statutory exception. Plaintiff did not request, authorize, or knowingly consent to the use of those technologies before they began capturing and transmitting the information described above.

63. Penal Code section 637.2 authorizes a private civil action and statutory damages for violations of CIPA. Plaintiff and the Tracking Class seek all remedies available under that provision.

## THIRD CAUSE OF ACTION

California Intrusion Upon Seclusion

64. Plaintiff incorporates the preceding paragraphs as though fully set forth herein.

65. Defendant intentionally intruded upon Plaintiff's private digital activity, device-related information, browsing session, referral path, and communications with AMFAM.COM by causing Tracking Technologies to collect and transmit identifying, routing, device, browser, and behavioral information before Plaintiff was given notice or a meaningful opportunity to consent. Plaintiff maintained a reasonable expectation that investigating a purported governmental communication would not cause her identity, device characteristics, referral information, and website activity to be secretly transmitted to multiple commercial third parties.

66. Defendant's intrusion was intentional because Defendant selected, configured, installed, permitted, or controlled the Tracking Technologies operating on AMFAM.COM and used the resulting information for commercial analytics, attribution, profiling, and advertising. Defendant caused Plaintiff's information to be disclosed to multiple third-party technology providers for Defendant's commercial purposes without first obtaining Plaintiff's informed consent.

67. The intrusion would be highly offensive to a reasonable person because it did not arise from an ordinary, knowingly initiated commercial visit. Plaintiff was induced to begin the journey by a message impersonating an official government communication and threatening adverse consequences to purported benefits. Before Plaintiff could understand that she had been redirected into commercial insurance marketing, Defendant's website began collecting and disseminating information about her device, identity, referral source, and behavior. The combination of governmental

impersonation, immediate undisclosed tracking, absence of meaningful choice, and transmission to multiple commercial recipients constitutes an egregious breach of reasonable privacy expectations and accepted social norms.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. For an order certifying that the action be maintained as a class action, that Plaintiff be designated as class representative, and that undersigned counsel be designated as class counsel;

b. For appropriate declaratory and injunctive relief, including an order prohibiting Defendant from using materially deceptive commercial email to promote its products and from deploying the challenged Tracking Technologies before providing legally sufficient disclosure and obtaining any consent required by law;

c. For actual, statutory, and liquidated damages in amounts authorized by law;

d. For punitive damages on the intrusion-upon-seclusion claim where permitted by law and proven at trial;

e. For pre- and post-judgment interest as allowed by law;

f. For attorneys' fees and costs where authorized by statute or other applicable law; and

g. For any and all other relief at law or equity that may be appropriate.

Dated: July 30, 2026 PACIFIC TRIAL ATTORNEYS, APC

By: /s/ Scott J. Ferrell
Scott J. Ferrell
Attorneys for Plaintiff and the Proposed Class